WORTH AND JANE P. ROWLEY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Rowley v. Commissioner
Docket No. 9480-77.
United States Tax Court
T.C. Memo 1979-338; 1979 Tax Ct. Memo LEXIS 188; 38 T.C.M. (CCH) 1297; T.C.M. (RIA) 79338; August 27, 1979, Filed *188 Petitioners owned a wooden boat. In February of 1976 it was discovered that petitioners' boat had been substantially destroyed by dry rot. Petitioners claimed a casualty loss deduction. Held: petitioners failed to show that the loss of their boat occurred "suddenly" within the meaning of section 165(c)(3), I.R.C. 1954. Daniel F. Shea, for the petitioners. Carolyn M. Parr, for the respondent. STERRETT
MEMORANDUM FINDINDS OF FACT AND OPINION STERRETT, Judge: By letter dated June 15, 1977 respondent determined a deficiency in income taxes paid by petitioners Worth and Jane P. Rowley for their taxable year ended December 31, 1975 in the *189 amount of $4,509.48. The sole issue for our decision herein is whether petitioners incurred an "other casualty" within the meaning of section 165(c)(3), I.R.C. 1954, when their wooden sailing vessel was damaged by "dry rot" fungus. If we find that petitioners suffered an "other casualty", then we must determine the amount of their loss. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, consisting of a stipulation of fact and an additional stipulation of facts, and the exhibits attached thereto are incorporated herein by this reference. Petitioners Worth and Jane P. Rowley, husband and wife, timely filed their joint Federal income tax return for their taxable year ended December 31, 1975 with the Director of the Baltimore District, Internal Revenue Service. In reporting their income petitioners utilized a cash receipts and disbursements method of accounting. At the time they filed their petition herein petitioners resided in Washington, D.C. As petitioner Jane P. Rowley is a party hereto solely by virtue of having filed jointly with her husband, "petitioner" as used herein shall refer only to Worth *190 Rowley. In 1960 petitioner acquired a one-half interest in a wooden 30-foot keel centerboard cruising sloop, named Kismet II, for $3,000. In early 1964 petitioner acquired the remaining half interest in Kismet II for $2,500. The Kismet II had been built in 1943. In 1960 the boat was in poor condition and needed repairs. This poor condition was due to deficient cosmetic maintenance of the boat's cabin, superstructure and sails. The necessary repairs and replacements to the cabin, superstructure and sails were subsequently made. From at least 1964 to 1976 the boat was berthed principally at Hartge Yacht Yard, Inc. (Hartge's) in Galesville, Maryland. During the period 1964-1975 petitioner paid Hartge's approximately the following amounts of money as berthing and servicing fees and for replacement parts for the Kismet II: 1964
$ 1,709.00
1965
710.00
1966
1,020.00
1967
3,233.00
1968
2,409.00
1969
1,943.00
1970
1,304.00
1971
1,782.00
1972
1,703.00
1973
1,586.00
1974
2,623.00
1975
3,830.00
12 Year Total
$23,852.00
Of this $23,852 total, $5,300 was spent for berthing expenses and $18,552 was spent for servicing, maintenance charges, and replacement *191 parts. Each spring from at least 1964 through 1975, it was petitioner's practice to have Hartge's check Kismet II for leaks, haul the boat out of the water, make any necessary repairs or replacements, and then paint it. In order to check the boat for leaks Harrge's had to pump out the bilge of the boat and then, while the boat was still in the water, mop the bilge dry. In this way leaks could be more easily determined. Petitioner maintained his boat exceptionally well. In 1961 petitioner paid $50 for a new jib sail, $250 for a replacement engine, and $30 for a new propeller. In 1962 petitioner paid $39 for a brass pulpit and $35 for plastic life lines. Also in 1962 workmen at Hartge's removed an area of "dry rot" from the roof of the cabin. In 1963 petitioner paid $19 for a new anchor for the boat. In 1964 petitioner had to replace the boat's original mast with a new one. The old mast had been a solid piece of wood which had become delaminated and warped. Petitioner replaced this mast with a new hollow mast at a cost of $738. Also in 1964 the cabin top was completely recanvassed, holes in the deck were filled, and new wood installed on the outside of the cabin. Petitioner *192 also bought a new navigator in 1964 for $88. In 1965 petitioner had his main deck recanvassed and paid $48 for a new sail cover. In 1966 the centerboard well area was discovered to be leaking. The area was rebuilt and a new centerboard costing approximately $215 installed. Also in 1966 petitioner paid approximately $52 for a new compass, $245 for a genoa jib sail, $112 for an awning, $32 for a new hatch cover, and $70 for new rigging. In April of 1967 Hartge's discovered and removed rotten wood from parts of the main deck, cabin roof, transom, and aft end of the cabin, including the thwartship beam. New wood was substituted for the bad wood, and the boat's entire deck recanvassed. Pieces of the ship's stem were removed. The mast was removed and repaired. A hatch was rebuilt. In 1967 petitioner also spent $163 for a frame, cover, and winter "tarp" to protect the boat. In 1968 petitioner paid $102 for new rigging, and approximately $200 to have plywood walls installed in the cabin's forward bunk area. Also in 1968 petitioner bought a dacron dodger, a hatch cover and four cabin cushions, all for $490. In April of 1968 petitioner specifically requested that the boatyard *193 replace any rotten wood it might find. In 1969 petitioner installed new stainless steel rigging on the boat at a cost of $353 and bought a new sail cover for $69. In 1971 petitioner bought two new spreader lights for $51. During that year Hartge's discovered that the head was leaking under the floorboards. Petitiner immediately had the head reconditioned to stop the leaking. While Hartge's record for Kismet II through 1968 showed a history of minor dry rot problems, Hrtge's records for the period 1969 to the fall of 1975 do not reflect that any dry rot was noticed anywhere on the boat. In January and February of 1975 torn canvas was removed from the deck, and the deck was patched and painted. In March 1975 petitioner, as he had for years in caring for the boat, requested Hartge's to haul the boat, check it over, and then paint it. He did not specifically request that Kismet II be checked for dry rot. Hartge's, as part of its annual check, inspected the boat's centerboard well area, in which some of the ribs and cabin floor beams were visible, but did not find any dry rot fungus. The rudder was removed and repaired and the boat was painted and then put back in the water. *194 Petitoner was ill in 1975. As a result, the boat sat idle at Hartge's throughout the 1975 sailing season (April through October) with the exception of one day when petitioner was able to use the boat. During 1975 the boat was pumped at least nine times on the following dates: March 20, May 9, May 19 (at which time the boat was also checked for leaks), July 17, August 20, September 11, September 24, October 14, and November 14. Kismet II was pumped at least 11 times in 1974 and at least 9 time in 1973. The greater part of the water accumulating in Kismet II's bilge during these years was fresh rain water which entered the bilge by way of an opening in the rudder/tiller area. Other fresh water might also have entered at various times through holes in the deck, portholes, etc. For several years prior to 1975 petitioner kept a tarp over the boat so as to keep rain water out of the boat. This tarp also, however, tended to elevate the boat's inside temperatures. In any event, no dry rot was detected by the laborers who mopped Kismet II's bilge and otherwise prepared her for sea in the spring of 1975. Hartge's general manager, Colonel Miller, who boarded the boat both in the spring *195 of 1975 and in August of 1975 did not smell or otherwise detect any dry rot fungus at either time. [1]
In November of 1975 Hartge's checked the boat for leaks and caulked the centerboard well area after noticing some dry rot fungus in the ribs and beams. At this point Miller first smelled the presence of dry rot fungus. Still, Miller did not consider the problem serious. Nothing in respect of the dry rot was done until February 1976. In February of 1976 Hartge's hauled the boat out of the water to work on the dry rot discovered the previous November. When the boat was opened up the full extent and severity of the dry rot damage was discovered. The decay, which began and was most severe in the centerboard well area, necessitated the replacement or sistering of nearly all the boat's ribs, which were of white oak, and some of the cabin floor beams, if the boat was to be saved. In the face of the excessive cost of these extensive repairs and replacements, petitioner sold the boat to Emil Hartge in 1976 for $576. Mr. Hartge rebuilt the boat and resold it to a third person in 1978 for $7,500. The purchaser was aware that the *196 boat had been the victim of dry rot. As rebuilt the boat had no centerboard and its cabin deck, which had been teak, had been replaced with linoleum. It is scientifically possible, but not probable, under ideal growing conditions, for one of the types of "brown" dry rot fungi (i.e. fungus which lends a brownish hue to infected wood) to destroy pieces of white oak, such as those found in the ribs of petitioner's boat, within a year's time. [2] Normally it would take at least 3 to 4 years for wood to be so destroyed by dry rot that it needs to be replaced. White oak, being more resistant to dry rot, should last even longer. OPINION "Dry rot" is the result of the operation of a fungus on wood. The fungus which causes "dry rot" is a bryophyte. The plants' spores may be blown *197 onto the boat by the wind, or carried on board on peoples' shoes. The plant will grow best in the presence of fresh water, temperature in excess of 60 degree F, and poor ventilation. The fungus itself feeds on wood, thereby, destroying it. The "dry rot" fungi cannot live in salt water. Unfortunately for our petitioner, and others similarly situated, all three of the above requirements for spore growth are found in the bilge of a wooden boat. Indeed dry rot is a common problem for wooden boats. In the usual case it would take a minimum of 3 years for wood infected by dry rot to decay to a point where it would need to be replaced. White oak is more resistant than other woods to dry rot. Thus its destruction would normally be even more prolonged. Further it would normally take longer than 3 years for an entire boat to be destroyed by dry rot, as was Kismet II. In the usual case, therefore, loss of a boat to dry rot would be the result of the progressive deterioration of the boat over a course of years through a steadily operating cause. It would require an unusual combination of circumstances to destroy a boat like Kismet II in approximately 1 year. Thus the parties have stipulated *198 that while such an occurrence is, under ideal growing conditions, scientifically possible it is clearly not probable.
Yet this is precisely what petitioner claims happened. Petitioner argues that the loss of his boat to dry rot damage, which he alleges occurred entirely within one 12-month period, is an "other casualty" within the meaning of section 165(c)(3). [3] Respondent concedes that the boat was damaged by dry rot. He goes on to argue, however, that the loss of Kismet II to dry rot was the result of a slow, "progressive deterioration" of the boat through a "steadily operating cause," and that, therefore, the boat's loss was not due to a "sudden" casualty within the meaning of section 165(c)(3). *199 Section 165(c)(3) allows a deduction for any loss arising from "fire, storm, shipwreck, or other casualty." In construing the words "other casualty" the cases have applied the doctrine of ejusdemgeneris. Thus the term "other casualty" has been interpreted to mean "an accident, a mishap, some sudden invasion by a hostile agency; it excludes the progressive deterioration of property through a steadily operating cause." Fay v. Helvering,120 F.2d 253 (2nd Cir. 1941), see also Dodge v. Commissioner,25 T.C. 1022, 1026 (1956). A literal application of this definition of "other casualty" would clearly preclude petitioner's recovery herein. Yet we have recognized that the concept of "suddenness" is a comparative one. Kilroe v. Commissioner,32 T.C. 1304, 1306 (1959). The so-called "fast termite" cases, for example, stand witness to the relative meaning of the term "sudden". Thus, in the case of Rosenberg v. Commissioner,198 F.2d 46 (8th Cir. 1952), *200 the court found that termite damage to a house, discovered one year after the building had been inspected by an experienced building contractor and architect and found to be clear of termites, was "sudden". This Court has undertaken to follow this line of cases. See Hoppe v. Commissioner,42 T.C. 820, 823 (1964). We have also previously impliedly accepted the reasoning that, at least with respect to the "suddenness" question in the section 165(c)(3) context, no distinction between dry rot and termite damage should be drawn. Hoppe v. Commissioner,supra at 823. See also United States v. Rogers,120 F.2d 244, 246 (9th Cir. 1941), affd. on rehearing 122 F.2d 485 (9th Cir. 1941). Thus, the question before us is the purely factual one of whether or not the dry rot damage here at issue occurred "suddenly", as opposed to merely being discovered suddenly. See Kilroe v. Commissioner,supra at 1306. In this regard, *201 the burden is on petitioner to prove his case. Welch v. Helvering,290 U.S. 111 (1933). While the issue is a relatively close one, we find that petitioner has failed to carry his burden in this regard. Petitioner's case turns on the annual inspections made by Hartge's while preparing the boat for each sailing season. He points out that the boat was "hauled", i.e. inspected and painted, during the first week of March of 1975. Prior to hauling a boat it was Hartge's practice to mop out the bilge area of the boat so that it could check the boat for leaks while it was still in the water. Thus, argues petitioner, the fact that the person who mopped the bilge did not report dry rot is evidence that none existed in March of 1975. Petitioner also relies on the fact that Hartge's general manager, Miller, inspected petitioner's boat both in the spring and again in August of 1975, and did not smell or otherwise detect any dry rot on board at those times. Finally, petitioner has provided us with climatological data which he claims shows that there was a higher than average rain fall in the Galesville area in 1975, providing ample fresh water, and that the heaviest rains *202 occurred from May to October of that year when the average temperature in that area was above 60 degree F. Thus petitioner argues that no, or at least no noticeable amount, of dry rot was present in the bilge as of August of 1975, but that over the months between May and October conditions propitious to dry rot growth did exist. He concludes that the dry rot attack must, therefore, have been a sudden one--starting sometime during the summer of 1975 and completely destroying the boat by February of the next year. Apparently petitioner would argue this is why Miller did not smell dry rot in the boat until November and why the boat was a total loss by February. In this way petitioner hopes to bring himself within the rule of the "fast termite" cases. We are unconvinced. Both petitioner's expert witness, Miller, and respondent's expert witness agree that it would be extremely unusual for any sort of dry rot, regardless of the strain, to work as quickly as petitioner claims is the case here--especially against white oak. Further, both agree that dry rot fungus is almost completely dormant during the cold winter months. We are thus asked to believe that the mild case of dry rot *203 infestation Miller discerned in November completely destroyed the ribs, cabin floor beams, and centerboard of the Kismet II by February, i.e. that most of the damage occurred during the cool winter months when the fungus was substantially dormant. Given the temperatures in the Galesville, Maryland area during the relevant months of 1975, as given in petitioner's climatological data, this would be an unreasonable belief. Thus, were we to hold for petitioner, we would perforce have to find that the dry rot which was undetectible in August, substantially destroyed the boat by November--a span of 3 months. It seems more reasonable to assume that, while undetectible in the spring inspection, the dry rot which destroyed the Kismet II was nonetheless present at both those times. This conclusion is supported by petitioner's own description of the boat's ribs as being "punky" in February. While dry rot fungus usually works from the surface of the wood to its core, the evidence indicates that wood can be destroyed from its core out. Respondent's expert testified that, in the usual case, it would take a "couple" of years for fungus to eat the surface of a piece of wood to a depth of approximately *204 1/8 of an inch--at which time the wood would still be salvageable. To think that white oak could be so ultimately destroyed by fungus as to crumble in one's hands within 3 months, or even a year, is, at least on the record before us, not believable. We conclude that, while the damage to petitioner's boat was discovered suddenly, it was itself the product of a slow and progressive deterioration of the boat through the steady assault of dry rot fungus over a course of years. We are unconvinced by petitioner's claim that his loss was due to a highly unusual and abnormally virulent attack of dry rot fungus. While we have found that under ideal, laboratory conditions dry rot could destroy pieces of white oak such as those found in Kismet II's ribs within a year, we do not believe this to be plausible within 3 months. But if not in 3 months, then we have no basis, on the facts before us, on which we could find that the destruction occurred in less than the 3 to 4 years it would normally take dry rot to do such damage. As 3 to 4 years is not "suddenly", we hold for respondent. As we have held for respondent on the first issue, we find it unnecessary to determine the amount of *205 petitioner's loss. Decision will be entered for Respondent.
Footnotes
1. Dry rot fungus emits a heavy, musty odor.↩
2. None of the strains of "white" dry rot, i.e. fungus which lends a whitish hue to infected wood, is capable of such rapid work. Petitioner never had Kismet II's damaged wood tested to determine whether or not it was infected by a brown dry rot fungus strain capable of such rapid destruction. Miller noted both brownish and whitish discolorations of the wood in November of 1975 and February of 1976.↩
3. SEC. 165. LOSSES. * * *
(c) Limitation on Losses of Individuals.--In the case of an individual, the deduction under subsection (a) shall be limited to-- * * *
(3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. A loss described in this paragraph shall be allowed only to the extent that the amount of loss to such individual arising from each casualty, or from each theft, exceeds $100.↩